Filed 2/4/15  P. v. Quezada CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JESSE QUEZADA et al.,<br><br>    Defendants and Appellants. | 2d Crim. No. B244800<br>(Super. Ct. No. BA332081)<br>(Los Angeles County)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered the opinion filed on January 12, 2015, be modified as follows:

On page 6, in the second full paragraph, the second sentence beginning "Corona had one or more tattoos," is deleted and replaced with the following:  Corona had tattoos everywhere, which Covarrubias thought meant he was a gang member.

On page 13, the first full paragraph is deleted and replaced with the following:  We are convinced beyond a reasonable doubt that the jury convicted Sierra on a theory of directly aiding and abetting premeditated murder.  In *Chiu*, the court concluded otherwise from the jurors' questions and comments indicating "that the jury may have been focusing on the natural and probable consequence theory of aiding and abetting[.]"  (*People v. Chiu*, *supra*, 59 Cal.4th at p. 168.)  Here, there are no similar indications.  More importantly, as we will discuss (at p. 15, *post*), the jury necessarily found that Sierra had the intent to kill—as opposed to the intent to batter or assault under

a natural and probable consequences theory—based on the gang murder special circumstance finding. In addition, the evidence that Sierra directly aided and abetted Quezada in the premeditated murder of Corona is overwhelming.

On page 13, in the second full paragraph, the last sentence beginning "After it became clear that Corona had a gang affiliation" is deleted and replaced with the following: After it became clear that Corona had one or more gang affiliations and Quezada pulled out a gun and asked Sierra what to do, Sierra told Quezada to kill Corona, presumably based on the mistaken assumption that Corona was a rival gang member.

[There is no change in the judgment.]

Appellant Sierra's petition for rehearing is denied.

Filed 1/12/15 (unmodified version)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JESSE QUEZADA et al.,<br><br>    Defendants and Appellants. | 2d Crim. No. B244800<br>(Super. Ct. No. BA332081)<br>(Los Angeles County) |

Codefendants Jesse Quezada, Peter Sierra, and Alex Garcia appeal the judgments entered after juries[1] convicted each of them of first and second degree murder (Pen. Code, §§ 187, subd. (a), 189)[2] and convicted Garcia of unlawful possession of a firearm (former § 12021, subd. (d)(1))[3] and unlawful possession of ammunition (former § 12316, subd. (b)(1)).[4] The juries found true the special circumstance allegations that each appellant suffered multiple murder convictions. (§ 190.2, subd. (a)(3).)

Regarding victim Roberto Rodriguez, the juries found that Garcia committed first degree murder and Quezada and Sierra committed second degree murder. As to each defendant, the juries found true the allegations that a principal personally and

---

[1] Appellants were jointly tried by two separate jury panels. Quezada and Garcia were tried by the "blue" jury and Sierra was tried by the "orange" jury.

[2] All statutory references are to the Penal Code unless otherwise stated.

[3] (Current § 29815, subd. (a).)

[4] (Current § 30305, subd. (a)(1).)

intentionally discharged a firearm causing Rodriguez's death (§ 12022.53, subds. (b), (c), (d), (e)(1)) and that the murder was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)). The juries found the special circumstance allegation that appellants murdered Rodriguez to further the activities of a criminal street gang (§ 190.2, subd. (a)(22)) to be true as to Garcia and untrue as to Quezada and Sierra.

Regarding victim Omar Corona, the juries found that Quezada and Sierra committed first degree murder and Garcia committed second degree murder. As to each defendant, the juries found true allegations that a principal personally and intentionally discharged a firearm causing Corona's death and that the murder was committed for the benefit of a criminal street gang. The juries found the special circumstance allegation that appellants murdered Corona to further the activities of a criminal street gang to be true as to Quezada and Sierra and untrue as to Garcia.

The trial court sentenced each appellant to a term of life in prison without the possibility of parole.[5] The court ordered appellants jointly and severally to pay $11,301.82 in victim restitution. (§ 1202.4, subd. (f).) The court imposed on each appellant a $10,000 restitution fine (§ 1202.4, subd. (b)), a $40-per-conviction court security fee (§ 1465.8), and a $30-per-conviction criminal conviction assessment (Gov. Code, § 70373). The court awarded presentence custody credit of 1,639 days to Quezada, 928 days to Sierra, and 1,634 days to Garcia.

Appellants contend that there was insufficient evidence to establish that Corona's murder was willful, deliberate, and premeditated and to support the gang murder special circumstance and gang enhancement allegations, that the trial court sua sponte should have instructed the jury that the gang murder and multiple murder special circumstances required a finding that they personally intended to kill the victims, that

---

[5] On the first degree murder counts, the court sentenced each appellant to consecutive terms of life without the possibility of parole plus 25 years to life for the firearm enhancements. On the second degree murder counts, the court sentenced each appellant to consecutive terms of 15 years to life plus 25 years to life for the firearm enhancements. The court sentenced Garcia to concurrent determinate terms of three years on the counts for unlawful possession of a firearm and unlawful possession of ammunition.

counsel rendered ineffective assistance by not requesting such an instruction, and that the natural and probable consequences doctrine violates constitutional guarantees of separation of powers and due process.[6] We will correct a clerical error in the amount of victim restitution imposed on Garcia, but otherwise affirm.

FACTS

*Prosecution Evidence*

*Victim Roberto Rodriguez*

Carlos Jauregui was a member of the Lower East Side (LES) gang. On April 22, 2008, he went to a birthday party for Angel Mendoza, another LES member, in Montebello. He drove his white Tahoe. On the way to the party, Jauregui picked up Sierra, Kimberly Covarrubias, Quezada, and Quezada's brother. Sierra was an LES member and Covarrubias, his girlfriend, was either an LES associate or active member. Quezada was a member of the gang Big Hazard, which is an ally of LES. Garcia, who was an LES member, was at the party with a friend.

At the party, Jauregui and the other LES members were drinking alcohol. Mendoza had a .22-caliber gun and Garcia had a .40-caliber gun, which they displayed to others at the party, including Sierra and Quezada. After about an hour, the group left and went to Jauregui's house. At Jauregui's house, everyone but Quezada's brother continued drinking alcohol.

After an hour to an hour and a half, the group headed to the LES neighborhood. Jauregui drove Sierra, Covarrubias, and Quezada's brother in the Tahoe. Garcia followed in his green Mustang with Quezada, Mendoza, Garcia, and Garcia's friend.

---

[6] Each of these arguments is made by only one appellant, but each appellant joins in all of the others' arguments. For stylistic purposes, we will refer only to the appellant who made the argument under discussion. Garcia, in a 56-page handwritten letter to the clerk, raises issues not addressed by appellate counsel. As a rule, we do not recognize pro per documents filed by defendants who are represented by counsel. (*People v. Clark* (1992) 3 Cal.4th 41, 173, abrogated on other grounds in *Crawford v. Washington* (2004) 541 U.S. 36.)

3

On the way to the neighborhood, Sierra had a phone conversation with Jorge Hernandez (Snake), another LES member. Snake told Sierra that he "had a problem with a guy" from East Los Angeles, where there are rival gangs to LES. Snake was concerned that this guy had a gun and could kill him. Snake told Sierra that he was at the Marengo Inn and needed their gun "in order to go and do something." Sierra told Jauregui what Snake had told him. Jauregui assumed that when a gang member has a problem with a rival gang member and needs a gun, that means the gun is going to be used to kill the rival gang member. Covarrubias also thought that Snake's problem with the person was gang-related because she did not think that Snake would call Sierra about it otherwise.

The two cars stopped at the intersection of Evergreen and Cesar Chavez. Jauregui walked up to the Mustang and told Garcia that Snake needed the gun. Garcia said he would have to talk to Mendoza about it. Mendoza was standing about 14 feet away, spray painting a wall with the graffiti "Little East Side, the barrio." Jauregui returned to the Tahoe. He called Garcia and told him to follow them.

When the Tahoe reached the Marengo Inn, Snake was there in a car with a young woman and her daughter. From the car, Snake pointed out Rodriguez, who was sitting on the steps in front of a nearby house, and said, "It's him." Jauregui drove up to the man and asked, "Where are you from, esse?"[7] Rodriguez replied, "I don't bang. I'm paisa."[8]

The group in the Mustang arrived and parked across the street from the Tahoe. Jauregui told Sierra, "Let's go." Sierra said, "No." "Let's smoke this mother fucker," and got out of the car. Some of the occupants of the Mustang, including Mendoza, got out, crossed the street, and ran with Sierra to the front of the motel. Then they came back to where Rodriguez was sitting. Jauregui told Quezada's brother, "Hey,

---

[7] According to Jauregui, when a gang member asks someone else where he is from, that means the gang member is challenging the other person by asking what gang he is in. If the person so challenged responds that he is from a rival gang, there can be violence. If one of the persons has a gun, he might kill the other.

[8] "Paisa" means not a member of a gang.

4

tell them not to kill him, he is a paisa." Quezada's brother then got out of the Tahoe and joined the group standing by Rodriguez.

Mendoza put his gun to Rodriguez's head and shot him. Rodriguez collapsed onto the ground. Sierra and Quezada's brother returned to the Tahoe. Sierra told Jauregui to drive. The two cars drove off. The group met up at Quezada's house to watch out for the police.

*Victim Omar Corona*

At Quezada's house, they continued drinking. Some of the group, including Jauregui, Mendoza, and Quezada, smoked crack cocaine. After an hour or two, the group left for Mendoza's father's house. Quezada brought a .38-caliber gun that he had purchased from Mendoza and was capable of firing only one round. Jauregui drove Quezada and Covarrubias in the Tahoe. Garcia drove his friend in the Mustang. Sierra went with either Jauregui or Garcia.[9] Mendoza went separately in a car that belonged to other friends of Garcia.

As they were driving, Covarrubias told Jauregui that guys from Gage Maravilla, a rival gang to LES, had beaten her up. When a fellow gang member is beaten up by a rival gang member, the gang will retaliate. To that end, Jauregui, Covarrubias, and Quezada decided to look for Gage Maravilla members. Jauregui telephoned Garcia and told him they were "going to go do a job on the Maravilla's [*sic*]," meaning that they were going to kill Maravilla members. Garcia followed in the Mustang. Covarrubias told the sheriff's department that they went to Gage Maravilla territory to "bang on enemies," which she explained meant to look for trouble and could lead to shootings or other violence.

After stopping along the way to spray paint LES graffiti, Jauregui drove to "the heart of Gage Maravilla." He and Quezada got out of the Tahoe. Jauregui spray painted "LES" over some Gage Maravilla graffiti. Quezada served as a lookout because it was dangerous to tag in a rival gang's territory. According to Covarrubias, Jauregui

---

[9] Jauregui testified that Sierra rode in the Mustang with Garcia. Covarrubias testified that he rode in the Tahoe with her and Jauregui.

and Sierra "claimed" LES and Quezada "claimed" Hazard, meaning they yelled out their respective gang names to let people know "where they are from."

Corona came out of a nearby house. He was a young man with a shaved head who looked to Jauregui and Covarrubias like a gang member. Sierra and Jauregui asked Corona where he was from. Corona said he was from Indiana Dukes, but said, "I don't bang no more. I don't bang no more. I'm cool." Sierra said, "We're cool with them." Jauregui shook Corona's hand and said, "Okay, bro. Nice to meet you." Jauregui, Sierra, and Garcia told Corona that they were from LES.

Either Garcia or Quezada told Corona to take off his shirt.[10] Corona had one or more tattoos, which Jauregui did not recognize and Covarrubias thought meant he was a gang member. Quezada pulled out a gun and asked, "What do I do?" Sierra said, "Smoke the mother fucker." Quezada shot Corona in the head from a distance of two to five feet.

Quezada and Jauregui ran to the Tahoe. Inside, Jauregui asked Quezada why he shot Corona when they were not enemies with him. Quezada responded, "we are" or "we do." Jauregui drove off, dropped off Sierra and Covarrubias, and went to Mendoza's house. Later, he went to his own house with the rest of the group.

*Gang Evidence*

Detective Eduardo Aguirre, the prosecution's gang expert,[11] testified that most gang members adopt monikers or nicknames when they enter the gang. Quezada's moniker was Chuy, Sierra's was Minor, Garcia's was Sniper, Jauregui's was Ghost, and Mendoza's was Evil. LES gang members use hand signs to signify their gang.

At the time of the murders, LES had approximately 15-20 active members. The gang has been involved in shootings of police officers and rival gangs, robberies, possession of handguns, vandalism, home break-ins, and stolen vehicles. LES members would commit these types of crimes with Big Hazard members because the two gangs get

---

[10] According to Jauregui, it was Garcia. Covarrubias testified that it was Quezada.
[11] Detective Aguirre offered testimony about criminal street gangs in general and LES in particular. Officer Jesse Rosales, a second gang expert, provided testimony limited to Big Hazard.

6

along with and trust one another.  Big Hazard had approximately 350 members.  Its primary activities were assaults, robberies, burglaries, vandalisms, narcotics sales, assaults on police officers, murders, and attempted murders.

Tattoos show allegiance to a particular gang.  They communicate gang membership to rival gang members and intimidate people living within the gang's community.  Tagging is another way for gang members to advertise that their gang represents the neighborhood.  When a gang puts up its own graffiti in a rival gang's territory, the gang is declaring war on the rival gang and a confrontation between the two groups would ensue.  If a gang member in the confrontation is armed with a handgun, it would likely be used.  These kinds of incidents occur very often.

Gangs often become rivals over territory.  LES borders Gage Maravilla.  If several gang members drive into a rival gang's territory late at night, they will likely enter into an armed confrontation with the rival gang.  In such situations, gang members as a rule will let one another know who has a gun.  Gang members often will sell or pass around their guns to other gang members.  Typically, they do not register these weapons in order to avoid being detected by law enforcement when they use them to commit crimes.

In gang culture, one gang member's problem becomes every member's problem.  For instance, if an LES member told other members of his gang that he had a problem with a person from the East Los Angeles gang, the gang members would be expected to "handle his problem."  This could range from a beat-down assault to a shooting resulting in death.

Many gang confrontations begin with the question "Where are you from." A gang member will ask this before robbing or shooting somebody to find out if he is from a rival gang.  Even if the person says that he is not from anywhere, the gang member will still shoot or rob him if he thinks the person is lying.  A gang member might perform a tattoo check to see if the person has any gang tattoos that identify his gang. Detective Aguirre opined that if the girlfriend of an LES member were beaten up by Gage Maravilla members, LES would retaliate with either another assault or a shooting.

7

Sierra and Garcia did not call any witnesses in their defense. Quezada called Dr. John Treuting, a toxicologist, to testify about the effects of alcohol and cocaine on the brain. As the level of alcohol in a person's blood increases, he experiences decreased inhibitions, a loss of critical judgment, and a diminished ability to perceive events going on around him, which may cause him to respond to situations abnormally. When cocaine enters the bloodstream, a person typically feels a sense of euphoria and reduced fatigue. However, cocaine can also cause a person to become extremely excitable, anxious, and paranoid, which can lead to violence. When alcohol and cocaine are consumed at the same time, they combine to form cocaethylene, a chemical that produces effects similar to cocaine, only amplified and prolonged.

## DISCUSSION

### *Sufficiency of the Evidence*

Quezada contends that the evidence of certain jury findings regarding Corona's murder was insufficient. First, he challenges the finding that he killed Corona willfully, deliberately, and with premeditation. He also challenges the gang murder special circumstance and gang enhancement findings.

In reviewing claims of insufficient evidence, we examine the entire record in the light most favorable to the judgment to determine whether there is substantial evidence—evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Maciel* (2013) 57 Cal.4th 482, 514-515.) We do not reweigh the evidence or reassess the credibility of witnesses. (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.) We accept the logical inferences that the jury might have drawn from the evidence even if we would have concluded otherwise. (*People v. Streeter* (2012) 54 Cal.4th 205, 241.) If the trier of fact's findings are reasonably justified by the circumstances, the opinion of the reviewing court that a contrary finding might also reasonably be reconciled with the circumstances does not warrant reversing the judgment. (*People v. Jones* (2013) 57 Cal.4th 899, 961.)

8

*Willful, Deliberate, and Premeditated Murder Finding*

"A conviction for murder requires the commission of an act that causes death, done with the mental state of malice aforethought (malice). (§ 187.)" (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.) "The law recognizes two degrees of murder. The degrees are distinguished by the mental state with which the killing is done. . . . A person who kills unlawfully and intentionally is guilty of first degree murder if the intent to kill is formed after premeditation and deliberation. (§ 189; [citation].) If the person kills unlawfully and intentionally but the intent to kill is not formed after premeditation and deliberation, the murder is of the second degree. [Citation.]" (*Ibid.*, fn. omitted.)

"'Premeditation and deliberation can occur in a brief interval. "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.'"' [Citation.] Premeditation can be established in the context of a gang shooting even though the time between the sighting of the victim and the actual shooting is very brief. [Citation.] 'A studied hatred and enmity, including a *preplanned*, purposeful resolve to shoot anyone in a certain neighborhood wearing a certain color, evidences the most cold-blooded, most calculated, most culpable, kind of premeditation and deliberation.' [Citation.]" (*People v. Sanchez* (2001) 26 Cal.4th 834, 849.) In reviewing the sufficiency of a finding of premeditation and deliberation, courts often consider evidence of the defendant's planning, motive, and method, although these factors "need not be present in some special combination or afforded special weight, nor are they exhaustive." (*People v. Booker* (2011) 51 Cal.4th 141, 173.)

Here, there was substantial evidence of planning. Quezada, Jauregui, and Covarrubias agreed to go into Gage Maravilla territory to retaliate for the attack on Covarrubias by members of that gang. While they were on their way, Jauregui called Garcia in the Mustang to tell him they were going to "do a job on the Maravilla's, [*sic*]" meaning they intended to find and kill Gage Maravilla members. Quezada's decision to arm himself with a gun is further evidence that he planned to use it to kill any rival gang members whom he encountered. (See *People v. Romero* (2008) 44 Cal.4th 386, 401.)

9

Motive is reasonably inferred from the hatred of rival gang members and the desire to retaliate for past acts of disrespect committed by rival gangs. (See *People v. Gonzales* (2011) 52 Cal.4th 254, 295.) Quezada argues that he had no motive to kill Corona because their gangs—Big Hazard and Indiana Dukes, respectively—were not rivals. However, the jury could have found that both Quezada and Sierra, who were under the influence of alcohol and cocaine, simply mistook Corona for a rival gang member when they saw his tattoo. They were in an area where they expected to encounter rival gang members. The fact that Quezada asked Sierra what to do after seeing Corona's tattoo suggests that he was uncertain whether or not it signified a rival gang. In the car immediately after the shooting, Jauregui confronted Quezada about the mistake, pointing out that LES and Corona's gang were not rivals. Quezada, evidently still confused, said "we are" or "we do," indicating that he thought they were.

The manner in which Quezada killed Corona also supports the premeditation finding. During the confrontation with Corona, Quezada pulled out a gun and asked Sierra what he should do, i.e., he sought guidance in deciding whether or not he should kill Corona. He waited for Sierra's reply—"Smoke the mother fucker"—before deciding to fire at Corona's head. This is paradigmatic evidence of premeditation and deliberation. Even if Quezada had not audibly debated over what course of action to take, his method of killing alone would support a deliberation finding. (See *People v. Mendoza* (2011) 52 Cal.4th 1056, 1071 ["[A] single shot to the head might support the inference of a deliberate intent to kill"]; *People v. Romero*, *supra*, 44 Cal.4th at p. 401 [holding that victim who "was killed by a single gunshot fired from a gun placed against his head" evidenced "execution-style manner of killing" that "supports a finding of premeditation and deliberation when . . . there is no indication of a struggle"].)

We conclude that the evidence was sufficient to support the jury's finding that Quezada killed Corona willfully, deliberately, and with premeditation.

10

*Gang Murder Special Circumstance and Gang Enhancement*

The gang murder special circumstance finding requires proof that "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang . . . and the murder was carried out to further the activities of the criminal street gang."[12] (§ 190.2, subd. (a)(22).) Similarly, the gang enhancement statute applies to felonies "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).)

Quezada contends that the evidence is insufficient to show that he murdered Corona for the benefit of LES and with the specific intent of promoting or furthering its activities. As to the former showing, neither the gang enhancement nor the gang murder special circumstance requires proof that the crime was committed for the gang's benefit. The gang enhancement can be satisfied by proof that the murder was "at the direction of" or "in association with" the gang, both of which apply here. Quezada shot Corona after being instructed to do so by Sierra, and Quezada participated in the plan to "do a job on the Maravilla's [*sic*]" in association with several LES members.

As to the latter showing, there was ample evidence of Quezada's specific intent to promote or further LES activities by shooting Corona. The gang expert testified that shooting rival gang members was one of LES's primary activities. By committing murders, LES members become feared, which enables them to conduct their other criminal activities within LES territory. Quezada had already furthered LES activities earlier that evening when he participated in the shooting of Rodriguez. When Corona appeared, Quezada and LES members challenged him about his gang membership and checked him for tattoos. When Quezada suspected that Corona's tattoo represented a rival gang, he pulled out a gun and asked an LES member what to do—essentially

_____

[12] In addition, the gang murder special circumstance requires proof that the defendant knew that gang members engaged in or had engaged in a pattern of criminal gang activity. (*People v. Carr* (2010) 190 Cal.App.4th 475, 485-488.) Appellants so stipulated.

11

offering to shoot a perceived LES rival.  This evidence adequately supports the jury's specific intent finding.

## *Jury Instructions*

Sierra argues in a letter brief that under *People v. Chiu* (2014) 59 Cal.4th 155, his first degree murder conviction must be reversed because his jury was improperly instructed that he could be liable under the natural and probable consequences doctrine. Sierra and Garcia both contend that the trial court erred by not sua sponte instructing the jury that the multiple murder special circumstance required a finding that, as aiders and abettors, they personally intended to kill the victims.  Sierra argues that the gang murder special circumstance also required an instruction on his personal intent to kill.[13]

## *Natural and Probable Consequences Doctrine*

The juries were instructed on three theories of first degree premeditated murder:  perpetrator liability, direct liability as an aider and abettor, and derivative liability as either an aider and abettor or a co-conspirator in the commission of an assault or battery, the natural and probable consequences of which were murder.  In *Chiu*, which was decided while this appeal was pending, the Supreme Court held that "a defendant cannot be convicted of first degree premeditated murder under the natural and probable consequences doctrine." (*People v. Chiu*, *supra*, 59 Cal.4th at p. 167.)  Thus, the instruction on the natural and probable consequences doctrine was legally incorrect.[14]

"When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in

---

[13] Quezada and Garcia's jury requested clarification on the difference between Garcia's liability for the gun use allegation, which referred to gun use by "a principal," and his liability for the gang murder special circumstance, which referred to an intentional killing by "the defendant."  The trial court instructed the jury that "[i]f one principal intentionally fires a weapon and causes death, then . . . that allegation would apply to all principals."  The court then explained that "[the gang murder] special circumstance would apply to every person not the actual killer who with the intent to kill aids, abets, counsels, commands, induces, solicits, requests or assists any actor in the commission of murder in the first degree."

[14] We assume without deciding that *Chiu* applies retroactively to appellants' convictions.

the record to find that the verdict was based on a valid ground. [Citations.]" (*People v. Chiu*, *supra*, 59 Cal.4th at p. 167.) Sierra's first degree murder convictions may be sustained only if "we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that [he] directly aided and abetted the premeditated murder."[15] (*Ibid.*)

We are convinced beyond a reasonable doubt that the instructional error was harmless. In *Chiu*, the court concluded otherwise from the jurors' questions and comments indicating "that the jury may have been focusing on the natural and probable consequence theory of aiding and abetting[.]" (*People v. Chiu, supra,* 59 Cal.4th at p. 168.) Here, there are no similar indications. Moreover, the evidence that Sierra directly aided and abetted Quezada in the premeditated murder of Corona is overwhelming.

Sierra had a motive to kill perceived Gage Maravilla members both as an LES member seeking to command respect for his gang and as Covarrubias's boyfriend seeking revenge for the attack on her. When Sierra saw Corona in rival gang territory, he attempted to ascertain Corona's gang affiliation. After it became clear that Corona had a gang affiliation and Quezada pulled out a gun and asked Sierra what to do, Sierra told Quezada to kill Corona, presumably based on the mistaken assumption that Corona was a rival gang member.

*Aider and Abettor's Intent to Kill*

A trial court must instruct the jury sua sponte on the general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case. (*People v. Banks* (2014) 59 Cal.4th 1113, 1159.) To prove that any special circumstance other than felony murder (§ 190.2, subd. (a)(17)) applies to an aider and abettor, the prosecution must establish the aider and abettor's intent to kill. (§ 190.2, subd. (c); *People v. Souza* (2012) 54 Cal.4th 90, 108.) "An erroneous

---

[15] Quezada was convicted of first degree murder for shooting Corona. His conviction could not have been based on the natural and probable consequences doctrine, which by definition does not apply to the perpetrator. We are convinced beyond a reasonable doubt that the instructional error was harmless as to Garcia's conviction for the first degree murder of Rodriguez because there was strong evidence that he directly aided and abetted it.

13

instruction on the intent to kill element of a special circumstance, however, 'does not require reversal if a reviewing court concludes . . . that the error is harmless beyond a reasonable doubt.' [Citations.]" (*People v. Nunez* (2013) 57 Cal.4th 1, 45.)

In instructing the jurors on the special circumstance findings, the trial court delivered CALJIC No. 8.80.1, but omitted the following optional language: "If you find that a defendant was not the actual killer of a human being . . . , you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill aided, abetted, counseled, commanded, induced, solicited, requested, or assisted any actor in the commission of the murder in the first degree."  Because appellants were not the perpetrators in five of the six murder counts (Quezada's murder of Corona being the exception), the court erred by excluding this language from the instruction.

The error, however, was harmless.  The multiple murder special circumstance does not require a finding of intent to kill more than one victim.  (*People v. Maciel*, *supra*, 57 Cal.4th at p. 521.)  Garcia's jury was properly instructed that the gang murder special circumstance required intent to kill (see *ante* fn. 13), and the jury found that special circumstance to be true for him in Rodriguez's murder.  Thus, even if Garcia's conviction for second degree murder was based on the natural and probable consequences doctrine because the jury doubted his intent to kill Corona, the jury properly found the multiple murder special circumstance to be true.  (See *Maciel*, at p. 521.)

Garcia disputes that the multiple murder special circumstance can apply when the defendant intended to kill only one victim.  He attempts to distinguish *Maciel* and other cases cited by the People on the grounds that those defendants were the actual killers of the victims (*People v. Rogers* (2006) 39 Cal.4th 826; *People v. Dennis* (1998) 17 Cal.4th 468) or the murders took place at the same time as part of a single plan and the defendant was convicted of first degree murder on all counts (*People v. Maciel*, *supra*, 57 Cal.4th 482).  The cases do not discuss these factors, however, because they are irrelevant.  The court's sole concern was avoiding an interpretation of section 190.2 that would conflict with constitutional guarantees.  "A statute which threatens to impose the

14

death penalty, or life without possibility of parole, upon a defendant who did not intend to kill, while permitting some deliberate killers to escape with lesser punishment, might on its face violate the cruel and unusual punishment or equal protection clauses." (*Carlos v. Superior Court* (1983) 35 Cal.3d 131, 136, overruled on other grounds in *People v. Anderson* (1987) 43 Cal.3d 1104, 1147.) So long as the defendant intended to kill at least one victim, the Constitution is satisfied. (*People v. Rogers*, *supra*, 39 Cal.4th at p. 892.)

The instructional error was also harmless as to Sierra. The trial court instructed his jury that "[y]ou must decide separately as to each of the defendants the existence or nonexistence of each special circumstance alleged in this case" and "[y]ou must decide separately each special circumstance alleged in this case as to each of the defendants." It further instructed the jury that "[t]o find that the special circumstance 'intentional killing by an active street gang member' is true, it must be proved: [¶] 1. The defendant intentionally killed the victim." Likewise, the verdict form identified Sierra as "the Defendant" and required the jury to find that "the defendant intentionally killed Omar Corona" in order to find the gang murder special circumstance to be true. Moreover, the evidence that Sierra intended to kill Corona—in particular, that he ordered Corona's death—was overwhelming. The jury could have had no reasonable doubt as to that element. (See *People v. Williams* (1997) 16 Cal.4th 635, 690.)

### Ineffective Assistance of Counsel

Garcia claims that his trial counsel rendered ineffective assistance by failing to request an "intent to kill" instruction for the multiple murder special circumstance and failing to object when none was given. Given our conclusion that the instructional error was harmless, Garcia cannot demonstrate the requisite prejudice to succeed on this claim. (See *People v. Fiu* (2008) 165 Cal.App.4th 360, 389, fn. 37.)

### Validity of the Natural and Probable Consequences Doctrine

Sierra contends that a murder conviction based on the judicially-created doctrine of natural and probable consequences is invalid because the Legislature alone is empowered to define the elements of crimes. For authority, he cites article 3, section 3 of the California Constitution. But this section merely states in general terms the idea that

15

there must be a separation of powers among the coordinate branches of government. (See Cal. Const., art. III, § 3 ["The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution"].)

Sierra also relies on case law interpreting section 6, which provides in relevant part that "[n]o act or omission . . . is criminal or punishable, except as prescribed or authorized by this Code." In *Keeler v. Superior Court* (1970) 2 Cal.3d 619, 631, superseded by statute on other grounds as stated in *People v. Taylor* (2004) 32 Cal.4th 863, 870, the Supreme Court described this section as embodying "a fundamental principle of our tripartite form of government, i.e., that subject to the constitutional prohibition against cruel and unusual punishment, the power to define crimes and fix penalties is vested exclusively in the legislative branch." Where the statutory language in the Penal Code is vague, however, "'the statutory definition permits, even requires, judicial interpretation.'" (*People v. Chiu*, *supra*, 59 Cal.4th at p. 164.)

Section 31, which establishes that aiders and abettors of crimes are treated as principals, does not define aiding and abetting and "does not expressly mention the natural and probable consequences doctrine." (*People v. Chiu*, *supra*, 59 Cal.4th at p. 164.) Consequently, the courts "may . . . determine the extent of aiding and abetting liability for a particular offense, keeping in mind the rational function that the doctrine is designed to serve and with the goal of avoiding any unfairness which might redound from too broad an application." (*Ibid.*) Because "[t]he natural and probable consequences doctrine was recognized at common law and is firmly entrenched in California law as a theory of criminal liability" (*id.* at p. 163), Sierra's argument to the contrary necessarily fails.

### *Garcia's Restitution*

Upon independent review, we observe a clerical error in the minute order and abstract of judgment insofar as they reflect that Garcia was ordered to pay $13,801.82 in victim restitution. The reporter's transcript indicates that appellants were jointly and severally ordered to pay $11,301.82 in victim restitution, consisting of $7,500

16

to the victim compensation and claims board and $3,801.82 to victim Herlinda Guzman. Accordingly, we will direct the clerk of the superior court to correct this error.

DISPOSITION

The clerk shall issue an amended abstract of judgment and an amended minute order for October 24, 2012, reflecting that the trial court imposed restitution on appellant Garcia in the amount of $11,301.82, consisting of $7,500 to the victim compensation and claims board and $3,801.82 to victim Herlinda Guzman. In all other respects, the judgments are affirmed.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:


GILBERT, P. J.


YEGAN, J.

17

Ronald S. Coen, Judge

Superior Court County of Los Angeles

---

Derek K. Kowata, under appointment by the Court of Appeal, for Defendant and Appellant Jesse Quezada.

Sara H. Ruddy, under appointment by the Court of Appeal, for Defendant and Appellant Peter Sierra.

Stephen Temko, under appointment by the Court of Appeal, for Defendant and Appellant Alex Alejandro F. Garcia.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson, Supervising Deputy Attorney General, Theresa A. Patterson, Deputy Attorney General, for Plaintiff and Respondent.